**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**MAY 25, 2023**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BIOCHRON, INC., a Washington corporation, KEVIN RUDEEN, an individual, BART BENNETT, an individual, JOHN GILLINGHAM, an individual, | ) ) ) ) ) ) | No. 38834-4-III |
| Respondents, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| BLUE ROOTS, LLC, a Washington limited liability company, | ) ) ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Blue Roots initially filed a demand for arbitration, but Biochron filed this action to enjoin that arbitration from proceeding. Blue Roots promptly moved the trial court to compel arbitration, but the court denied the motion on the basis that the agreement containing the arbitration clause was unenforceable. The parties participated in litigation for over one year. Biochron moved for partial summary judgment, and Blue Roots renewed its motion to compel arbitration. The trial court granted Biochron's motion, denied Blue Roots's renewed motion to compel, and entered a CR 54(b) order certifying finality. Blue Roots appealed.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

We conclude that the trial court erred in denying Blue Roots's renewed motion to compel arbitration because the enforceability of a contract containing an agreement to arbitrate is a question for the arbitrator, not the court. In general, a court may only decide whether the agreement to arbitrate exists in a record and whether the arbitration clause can be fairly read to encompass the scope of the dispute. Here, we decide both questions in favor of arbitration.

We further conclude that Biochron is unable to meet its heavy burden of showing that Blue Roots waived its right to arbitrate. Blue Roots filed a demand for arbitration and twice moved the trial court to compel arbitration. These actions are consistent with a desire to arbitrate.

Also, ordering arbitration will not prejudice Biochron. The trial court entered two partial summary judgment orders during the course of litigation. Blue Roots has waived any challenge to the first ruling, and the second ruling was erroneous—the grant of partial summary judgment dismissing Blue Roots's misappropriation of trade secrets claim. Because we would have reversed the trial court's second ruling, Biochron is not prejudiced by Blue Roots's delay in renewing its motion to compel arbitration. That is, it would have had to litigate the trade secrets claim in one forum or the other.

2

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

We reverse the trial court's order denying Blue Roots's renewed motion to compel arbitration.

FACTS

This appeal stems from a failed effort by Blue Roots LLC to purchase the assets of Biochron, Inc. Blue Roots and Biochron are both licensed commercial cannabis producers located in Spokane County. We set forth the facts in the light most favorable to Blue Roots to the extent they relate to its misappropriation of trade secrets claim, which the trial court dismissed by partial summary judgment.

*Memorandum of understanding*

On May 21, 2019, the parties executed a memorandum of understanding (MOU), which we attach as an appendix to this opinion. The MOU outlined the terms of the sale of all of Biochron's assets, including its license with the Washington State Liquor and Cannabis Board,[1] to Blue Roots. The MOU stated it was "a commitment by the Parties to complete a transaction as defined in this Agreement and memorialize the terms and conditions in a definitive asset purchase agreement (the "APA") and any related

---

[1] Biochron states that the MOU did not agree to transfer Biochron's license. To the contrary, while the MOU states the purchased assets will not include an interest in the business entity that *holds* Biochron's license—i.e., Biochron itself—it expressly provides for the transfer of the license after 10 years of payments.

3

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

transactions necessary to execute the APA and achieve the Parties' objectives." Clerk's

Papers (CP) at 49. Biochron, Inc., and its individual principals, Bart Bennett, Kevin

Rudeen, and John Gillingham, collectively acted as the sellers. The MOU anticipated that

the transaction would close on June 1, 2019. It listed a condition precedent: that the

parties would obtain legal analysis of the transaction to ensure it would comply with

Liquor and Cannabis Board regulations.

The MOU provided that Blue Roots would purchase 100 percent of Biochron's

assets except any interest in the Biochron business entity itself. The assets were to "be

carefully defined in the APA," but included Biochron's real property, business assets,

intellectual property, and "grow" plant material in any form. CP at 49, 52. In exchange,

Blue Roots would pay Biochron 10 percent of its monthly net profits for 10 years,

beginning six months after the execution of the asset purchase agreement and would

employ Biochron's president, Mr. Bennett, as a manager in Blue Roots for a salary of

$5,000 per month.

The MOU included a section entitled "Dispute Resolution." CP at 51 (some

capitalization omitted). The section provided:

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

> The Parties will resolve any discrepancy of interpretation on an amicable basis and with the utmost good will and cooperation. In the event of any irresolvable disagreement between the parties, the parties agree to submit to arbitration via the AMERICAN ARBITRATION ASSOCIATION, to be conducted in the City of Spokane, Washington.

CP at 51.

Allan Holms, managing member of Blue Roots, signed on behalf of the company. Mr. Bennett signed on behalf of Biochron. By signing, each represented they had "sufficient authority to enter into this MOU on behalf of the identified party and bind such party to the terms herein." CP at 51.

*Joint operations*

The asset purchase agreement was not completed by June 1, 2019. However, in June, Biochron turned over its assets and keys to its facility, and Blue Roots began overhauling Biochron's facility to meet its standards for growing cannabis. Also in June, Blue Roots opened a new bank account for joint operating expenses. In July, Blue Roots began paying Mr. Bennett a salary as agreed in the MOU. Blue Roots also paid for the expansion of Biochron's facility and required that Biochron's remaining operations be modified to meet Blue Roots's standards. When the expansion was complete, Blue Roots delivered its mother plants to be propagated at Biochron's facility.

5

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

An attorney and an accountant experienced in the cannabis industry reviewed the MOU and determined it should be modified to stay within the guidelines of the Liquor and Cannabis Board. They recommended the parties adopt a product purchase and option agreement. Thereafter, Blue Roots and Biochron began negotiations for a product purchase and option agreement.

In late September or early October 2019, the parties agreed to the terms of a joint venture, although they did not sign any document memorializing the agreement. The terms of the joint venture agreement "would mirror the original MOU" with three changes. CP at 633. The changes were: (1) the agreement would be a product purchase agreement (rather than a purchase of all of Biochron's assets), and Blue Roots would purchase all of Biochron's product; (2) Blue Roots would pay Biochron its monthly operating expenses and, beginning December 1, 2019, Blue Roots would additionally pay Biochron 10 percent of Blue Roots's net profit from the previous month's sale of Biochron's product; and (3) Blue Roots would assume the responsibility of managing the grow operations and the costs of production. In January 2020, Blue Roots began making the payments as outlined in the proposed joint venture agreement and those payments continued through April 2020.

6

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

In February, Blue Roots e-mailed Biochron an "Intellectual Property Policy And Non-Disclosure Agreement" and directed Biochron to have each employee sign it. CP at 656 (some capitalization omitted). The agreement required Biochron employees not to disclose the "innovative processes and products, including unique strains of cannabis plants" used by Biochron. CP at 656 (boldface omitted). It further stated that the products and strains were the property of the "Company," which the agreement defined as Biochron. CP at 656-57.[2] One week later, Biochron confirmed that all of its employees signed the agreement and that a signed agreement was in each employee's file.

In April, the parties' business relationship began to sour. Biochron, which had previously been negotiating on its own behalf, retained counsel to continue the negotiations of the product purchase agreement. By May, that agreement had been divided into two separate documents: a product purchase agreement and an asset purchase and sale agreement. The parties ultimately could not agree on the pricing for Blue Roots's purchase of Biochron's cannabis harvest, and Biochron began selling its cannabis

---

[2] At the time, Biochron was growing Blue Roots's strains according to Blue Roots's processes. Viewing the evidence and all reasonable inferences in favor of Blue Roots, because it was Blue Roots who required Biochron's employees to sign the agreement, a reasonable trier of fact could find that both Blue Roots and Biochron understood and intended for the agreement to protect *Blue Roots's* strains and processes, not Biochron's.

7

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

harvest to third parties. Thereafter, the parties' relationship completely broke down and the acquisition fell through. On June 16, Blue Roots declared an impasse.

Because Blue Roots anticipated it would soon own Biochron's entire business, it had disclosed proprietary information to Biochron, including its mother plants and grow processes. After negotiations ceased, Blue Roots demanded that Biochron return Blue Roots's cannabis plants and cease using Blue Roots's grow processes. Biochron refused to do so.

*Trial court enjoins Blue Roots's arbitration demand*

Blue Roots filed an arbitration demand in August against Biochron and its individual owners, Bart Bennett, Kevin Rudeen, and John Gillingham. On September 18, Biochron filed this case in Spokane County Superior Court, requesting injunctive relief from Blue Roots's arbitration demand and damages. It also moved for a temporary restraining order and preliminarily injunction preventing Blue Roots from pursuing arbitration.

On October 9, Blue Roots moved to compel arbitration. It later opposed Biochron's motion for a preliminary injunction. Blue Roots argued that under Washington law, a challenge to the MOU as a whole, rather than the arbitration clause

8

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

itself, was a question for the arbitrator to decide, and the arbitration clause itself covered any irresolvable disagreement.

At oral argument on the motions, Biochron argued the MOU was an unenforceable agreement to agree. The court questioned whether the arbitration clause would be enforceable even if the MOU was not. Blue Roots noted that termination or failure of a contract typically does not terminate an arbitration agreement contained therein. The court disagreed.

On October 27, the court entered a written order granting Biochron's motion for a preliminary injunction in which it concluded in part:

1. Challenges to the very existence of a contract, as opposed to its validity, must be decided by the court.
2. The MOU is not a contract.
3. The MOU is an unenforceable agreement to agree.

CP at 467. The court denied Blue Roots's motion to compel arbitration.

*Continued litigation*

Blue Roots did not seek appellate review of the orders. It instead filed an answer to Biochron's complaint and asserted counterclaims against it, including claims for trade secret misappropriation. On December 31, Blue Roots moved for a preliminary injunction to protect its purported trade secrets and order return of certain cannabis plants. On January 8, 2021, Biochron moved for partial summary judgment to dismiss

9

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Biochron's owners in their individual capacities. For reasons that are not apparent in our record, the court did not rule on either motion for more than one year. During the interim, a trial date was set for April 25, 2022.

On January 26, 2022, the trial court denied Blue Roots's motion for a preliminary injunction. It granted in part Biochron's motion for partial summary judgment, dismissing Blue Roots's counterclaims against John Gillingham in their entirety, and its counterclaims against Bart Bennett and Kevin Rudeen, except for the claims of misappropriation of trade secrets, unfair competition, and conversion.

On January 28, Blue Roots filed a motion to continue the trial date and associated deadlines. Biochron opposed the continuance. On February 11, Biochron filed a second motion for partial summary judgment, seeking to dismiss Blue Roots's misappropriation of trade secrets counterclaim.

Three days later, Blue Roots filed a renewed motion to compel arbitration. It argued the MOU was an enforceable contract with open terms and was further enforceable based on the parties' course of conduct. Alternatively, it argued the arbitration agreement was severable, and it had not waived its right to arbitrate by participating in litigation.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

In response to Biochron's motion for partial summary judgment, Blue Roots argued that the parties' course of conduct created a partnership and associated fiduciary duties, including the duty of confidentiality. Supported by expert declarations, it argued that its cannabis cultivars and grow processes were proprietary information. It further argued that because of the existence of fiduciary duties between the parties, its disclosures to Biochron were made with reasonable efforts to maintain its secrecy.

The trial court considered Biochron's partial summary judgment motion and Blue Roots's renewed motion to compel arbitration at the same hearing. The court granted Biochron's motion on the sole basis that Blue Roots had failed to take reasonable efforts to protect the confidentiality of its purported trade secrets. It denied Blue Roots's renewed motion to compel arbitration because it believed Blue Roots had not provided a sufficient reason for the court to overturn the first judge's ruling.

The trial court later granted CR 54(b) certification of the second partial summary judgment order and stayed litigation of Blue Roots's remaining claims. Blue Roots then appealed the partial summary judgment order and the order denying its renewed motion to compel arbitration.

11

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

ANALYSIS

A.     MOTION TO COMPEL ARBITRATION

Blue Roots argues the trial court erred in denying its renewed motion to compel

arbitration.  We agree.

We review a trial court's determination of the arbitrability of a dispute de novo.

*Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 797, 225 P.3d 213 (2009).  "'The

party opposing arbitration bears the burden of showing that the agreement is not

enforceable.'"  *Id.* (quoting *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 302, 103

P.3d 753 (2004).

Biochron advances three arguments why this matter should not be submitted to

arbitration: (1) there was no enforceable agreement to arbitrate because the MOU is

unenforceable, (2) the claims made by Blue Roots are outside the scope of the arbitration

provision, and (3) Blue Roots waived arbitration by participating in litigation.  We discuss

each argument in turn.

1.     *The trial court erred when it inquired about the enforceability of the MOU*

The trial court concluded that to reach the arbitration clause, it first needed to

determine if the MOU was enforceable.  This was error.

12

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Where the party opposing arbitration does not bring a discrete challenge to the arbitration provision, but instead challenges the agreement as a whole, that challenge is for the arbitrator to decide. *Townsend v. Quadrant Corp.*, 173 Wn.2d 451, 459-60, 268 P.3d 917 (2012) (lead opinion of Alexander, J.) (citing *McKee v. AT&T Corp.*, 164 Wn.2d 372, 191 P.3d 845 (2008); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)), 464 n.4 (concurring/dissenting, Stephens, J.).

Here, Biochron argued to the trial court that the agreement was an unenforceable agreement to agree. Thus, its challenge was to the MOU itself, it was not a discrete challenge to the arbitration provision. The trial court erred by overstepping its limited authority when it inquired into the enforceability of the MOU.[3]

---

[3] We note that in its demand for arbitration, Blue Roots requested specific performance of the MOU. However, Blue Roots also sought additional relief on other theories, including breach of oral agreement/course of conduct, misappropriation of trade secrets, unjust enrichment, civil conspiracy, promissory estoppel, and an injunction. These additional theories are not dependent on an enforceable written contract. Nor, as explained later, is the arbitration provision limited to resolving a claimed breach of the MOU's written terms.

13

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

2.      *The scope of the arbitration provision covers this dispute*

The court, not the arbitrator, decides if a claim or controversy is subject to an agreement to arbitrate. RCW 7.04A.060(4). Biochron suggests that the arbitration clause covers only disagreements about a "discrepancy of interpretation" of the MOU. CP at 33. While that is a plausible interpretation, Washington's public policy favoring arbitration requires that we order arbitration "[i]f we can fairly say that the parties' arbitration agreement covers the dispute." *Davis v. Gen. Dynamics Land Sys.*, 152 Wn. App. 715, 718, 217 P.3d 1191 (2009); *cf. Townsend v. Quadrant Corp.*, 153 Wn. App. 870, 887, 224 P.3d 818 (2009), *aff'd*, 173 Wn.2d 451 (requiring arbitration unless the agreement to arbitrate "cannot be interpreted to cover a particular dispute").

Here, the arbitration provision expressly covers "*any* irresolvable disagreement between the parties." CP at 51 (emphasis added). Given the context of the provision within the MOU (and the parties' later performance of the purported joint venture agreement that would incorporate the nonconflicting terms of the MOU), we conclude that the scope of the arbitration provision fairly includes any disagreement between the parties as they worked toward consummating a final business agreement. This certainly includes the causes of action asserted in Blue Roots's demand for arbitration.

14

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

>    3.    *Whether Blue Roots waived its right to arbitrate depends on whether Biochron is prejudiced by Blue Roots's delay in renewing its motion to compel arbitration*

Biochron argues that even if the arbitration clause is enforceable, Blue Roots has waived its right to arbitrate.

"We review de novo whether a party has waived the right to arbitration." *Jeoung Lee v. Evergreen Hosp. Med. Ctr.*, 195 Wn.2d 699, 705, 464 P.3d 209 (2020). To determine if a party has waived its right to arbitration, we consider three factors: "'(1) knowledge of an existing right to compel arbitration, (2) acts inconsistent with that right, and (3) prejudice.'" *Id.* (internal quotation marks omitted) (quoting *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 362, 103 P.3d 773 (2004)). The parties do not dispute that Blue Roots knew of its right to compel arbitration; we thus confine our discussion to the second and third factors.

>    1.    *Acts inconsistent with right to arbitrate*

"Whether a party has waived its right [to arbitration] by its conduct depends on the particular facts of the case and is not susceptible to bright line rules." *Berman v. Tierra Real Est. Grp., LLC*, 23 Wn. App. 2d 387, 400, 515 P.3d 1004 (2022). To show a party has acted inconsistent with its right to arbitrate, the opposing party must show "that as events unfolded, the party's conduct reached a point where it was inconsistent with any

15

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

other intention but to forgo the right to arbitrate." *River House Dev., Inc. v. Integrus Architecture, PS*, 167 Wn. App. 221, 238, 272 P.3d 289 (2012). The party asserting waiver "has a 'heavy burden of proof.'" *Id.* at 237 (quoting *Steele v. Lundgren*, 85 Wn. App. 845, 852, 935 P.2d 671 (1997)).

The trial court originally denied Blue Roots's motion to compel arbitration because it concluded the MOU was an unenforceable contract and therefore there was no valid agreement to arbitrate. Blue Roots then, together with Biochron, engaged in discovery. But we have previously held that engaging in discovery is not inconsistent with arbitration, in which discovery is also available. *See Lake Wash. Sch. Dist. No. 414 v. Mobile Modules Nw., Inc.*, 28 Wn. App. 59, 64, 621 P.2d 791 (1980); RCW 7.04A.170.

We turn now to discuss cases that analyze whether a party seeking arbitration has acted inconsistent with an intent to arbitrate.

In *Lee*, an employee filed a putative class action lawsuit against her former employer, alleging it failed to provide rest and meal breaks in accordance with Washington law. 195 Wn.2d at 700-01. As an affirmative defense, the employer asserted that the employee had failed to exhaust the grievance and arbitration process under her collective bargaining agreement, but it did not move to compel arbitration until the employee filed her second amended complaint, nearly one year after she filed her initial

16

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

complaint. *Id.* at 703-04. In the meantime, the employer had unsuccessfully opposed class certification, sought dismissal of the case, engaged in discovery, and opposed the employee's motion to continue trial on the basis it was prepared for trial, all without moving to compel arbitration. *Id.* at 703. The trial court denied the motion to compel arbitration in part because the parties had been litigating the same issues for months, and the employer had not previously sought to enforce its right to arbitration. *Id.* at 704.

Our Supreme Court affirmed, noting that while the employer listed arbitration in its answer, it participated in discovery and litigation and did not move to compel arbitration "until the third iteration of the complaint even though the complaint had almost identical claims throughout." *Id.* at 708. The court also pointed to the fact that when the employee moved to continue trial, the employer opposed the continuance because it was ready to go to trial. *Id.* In addition to the employer acting inconsistently with its right to arbitrate, arbitration would severely prejudice the employee because she had spent a large amount of money on the litigation and it would give the employer the opportunity to relitigate class certification, an issue on which it had lost. *Id.*

In *River House*, a developer sent a demand letter to an architect stating its intent to pursue arbitration regarding a contract dispute, but subsequently filed a complaint in superior court due to concerns about the statute of limitations. 167 Wn. App. at 225-26.

17

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

In a joint case status report, the developer agreed to eliminate language that arbitration would be pursued, although it retained language about mediation. *Id.* at 227. During discovery, the developer failed to mention arbitration but extensively discussed its trial strategy. *Id.* at 228. Approximately nine months after it filed its complaint, the developer moved to stay the lawsuit and compel arbitration. *Id.* at 228-29. The trial court denied the motions, concluding the developer had waived its right to arbitrate. *Id.* at 229.

We affirmed, noting that despite the developer's "equivocation early in the process," it chose to file a lawsuit instead of a demand for arbitration. *Id.* at 238. When it moved to compel arbitration, it had been participating in the lawsuit for months without making mention of arbitration. *Id.* at 238-39. We concluded that the developer's conduct was inconsistent with any other intention but to forgo arbitration such that it had waived its contractual right. *Id.* at 239.

By contrast, in *Townsend*, two families sued their home builder and its parent companies. 173 Wn.2d at 454. The builder moved to stay the proceedings and compel arbitration per its contracts with the families, while the parent companies moved for summary judgment on the basis they had no connection to the plaintiffs or their houses. *Id.* After the superior court denied the motions and consolidated the suit with those of two more families, the builder and its parent companies again moved to compel

18

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

arbitration. *Id.* at 454-55. The superior court again denied the motion, concluding there were issues of fact as to whether the families' contracts with the builder were enforceable. *Id.*

After concluding that the enforceability of the contract was an issue for the arbitrator because the families challenged the contracts as a whole rather than the arbitration clause, as discussed above, our Supreme Court found that the parent companies had not waived their right to arbitrate by first moving for summary judgment. *Id.* at 462. They had promptly moved to compel arbitration after their motion for summary judgment, which did not evince an intent to waive arbitration. *Id.* at 463.

Here, unlike in *Lee* and *River House*, Blue Roots did not equivocate or delay in asserting its right to arbitrate. It filed a demand for arbitration before any litigation commenced. When Biochron filed this suit to enjoin arbitration, Blue Roots promptly asserted its right to arbitrate. When that was unsuccessful, Blue Roots mostly played defense to Biochron's two partial summary judgment motions and its motion to compel discovery. The only affirmative motions Blue Roots filed were an unsuccessful motion to return its property and purported trade secrets, and a later motion to continue the trial date and associated deadlines. As in *Townsend*, this mostly defensive posture is not inconsistent with an intent to arbitrate the dispute.

19

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Biochron complains that Blue Roots did not appeal the initial denial of its motion to compel arbitration and extensively participated in discovery. We agree that the order was immediately appealable under RAP 2.2(a)(3), *see Verbeek Props., LLC v. GreenCo Env't, Inc.*, 159 Wn. App. 82, 86, 246 P.3d 205 (2010), and acknowledge that early appellate intervention would have curtailed the litigation below. But it is not enough that Blue Roots failed to exhaust a potential remedy, Biochron must show that Blue Roots's actions were inconsistent with any other intention but to forgo the right to arbitrate. *River House*, 167 Wn. App. at 238. We conclude that Biochron does not show that Blue Roots's actions evince that intention.

### 2. *Prejudice*

Biochron argues it will be prejudiced if the matter is sent to arbitration because, like the plaintiff in *Lee*, it has incurred substantial attorney fees and costs during litigation. We are not convinced. "'Incurring legal expenses inherent in litigation, without more, is insufficient evidence of prejudice to justify a finding of waiver.'" *Wiese v. CACH, LLC*, 189 Wn. App. 466, 481, 358 P.3d 1213 (2015) (quoting *PPG Indus., Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir. 1997)). Further, unlike the plaintiff in *Lee*, Biochron was on notice that Blue Roots sought to arbitrate their dispute before Biochron incurred these expenses; indeed, Biochron filed this suit to enjoin Blue

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Roots from proceeding with its arbitration demand. To the extent Biochron incurred additional expenses due to Blue Roots's delay in reasserting its right to arbitration, Biochron fails to show that expense was due to Blue Roots's conduct instead of its own offensive litigation, including two motions for partial summary judgment.

Biochron's strongest argument for waiver is that Blue Roots failed to renew its motion to compel arbitration until after Biochron filed its second partial summary judgment motion, which sought to have Blue Roots's misappropriation of trade secrets claim dismissed. Indeed, Biochron succeeded in this motion. And if we reverse the trial court and send this dispute to arbitration, all of the trial court's previous rulings are arguably void for lack of authority. *See Lee*, 195 Wn.2d at 708 ("[A]n effective attempt to use arbitration to relitigate a motion that was lost on the merits can support a finding of substantive prejudice.").

In this case, the trial court made two significant rulings. The first dismissed all of Blue Roots's counterclaims against Mr. Gillingham and some of its counterclaims against Mr. Bennett and Mr. Rudeen. But during oral argument before this panel, Blue Roots said it was not seeking to overturn that ruling. Wash. Court of Appeals oral argument, *Biochron, Inc. v. Blue Roots, LLC*, No. 38834-4-III (Apr. 26, 2023), at 3 min., 2 sec. through 3 min., 41 sec. (on file with court).

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

The second ruling dismissed Blue Roots's misappropriation of trade secrets claim. Blue Roots challenges this ruling in this appeal. If Blue Roots prevails in this challenge, Biochron will not have suffered prejudice because of Blue Roots's delay. In other words, Biochron will have to litigate the misappropriation of trade secrets claim either in court or in arbitration. To determine whether Biochron was prejudiced by Blue Roots's delay, it therefore is necessary for us to decide if the trial court erred in summarily dismissing Blue Roots's misappropriation of trade secrets claim.

B.    TRADE SECRETS

Blue Roots contends the trial court erred in dismissing its misappropriation of trade secrets claim. We agree.

We review a summary judgment de novo, "engag[ing] in the same inquiry as the trial court." *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). A party moving for summary judgment must show there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. CR 56(c). A material fact is one on which the outcome of the litigation depends. *Clements*, 121 Wn.2d at 249. In deciding a motion for summary judgment, the court views all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Id.*

22

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

      1.      *Trial court's failure to consider evidence*

As a preliminary matter, Blue Roots contends the trial court erred by not considering earlier-filed declarations it cited and referenced in its response to Biochron's second partial summary judgment. We first provide some context for this issue.

In its memorandum response to Biochron's motion, Blue Roots cited declarations it filed early in the litigation. But it did not provide a bench copy of those declarations. The court stated it did not review those documents because it believed they were not appropriately provided as required by local rule. The local rule is Spokane County Local Civil Rule (LCR) 40(b)(12)(D): "Any documents previously filed and cited for review by the court, shall be provided as bench copies." LCR 56(c)(2)(G), relating specifically to dispositive motions, instructs that practitioners should comply with LCR 40(b)(12) regarding bench copies. LCR 56(c)(3) instructs that a failure to comply with the rule is governed by LCR 40(b)(6). LCR 40(b)(6) in turn provides that "[i]n the event a party fails to comply with LCR 40 or LCR 56, including . . . providing bench copies, . . . the court shall have the discretion to not consider the document or citation, strike the document, strike the hearing, continue the hearing, and/or impose terms or sanctions." Thus, under the local rules, the trial court had the authority not to consider Blue Roots's improperly presented evidence.

23

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Although the court had the authority not to consider the evidence, on summary judgment,

> the decision to exclude evidence that would affect a party's ability to present its case amounts to a severe sanction. And before imposing a severe sanction, the court must consider the three *Burnet*[4] factors on the record: whether a lesser sanction would probably suffice, whether the violation was willful or deliberate, and whether the violation substantially prejudiced the opposing party.

*Keck v. Collins*, 184 Wn.2d 358, 368-69, 357 P.3d 1080 (2015) (citation omitted).

The trial court did not consider any of the *Burnet* factors on the record before deciding to disregard Blue Roots's evidence. It therefore erred in refusing to consider Blue Roots's previously filed evidence that was not provided as bench copies. In our de novo review of Biochron's motion for partial summary judgment, we will consider all evidence incorporated by reference by Blue Roots in its response.

2.      *Summary judgment dismissing misappropriation of trade secrets claim*

Blue Roots claims Biochron misappropriated its trade secrets, namely, its cannabis cultivars and grow processes, and argues there are genuine issues of material fact precluding summary judgment on its claims. We agree.

---

[4] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997).

24

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Under the Uniform Trade Secrets Act (UTSA), chapter 19.108 RCW, a "trade secret" is information that:

> (a)  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (b)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

RCW 19.108.010(4).  "We review interpretation of the UTSA de novo as a question of law, while we review whether specific information satisfies the statute's definition of a 'trade secret' in any given case as a question of fact."  *Lyft, Inc. v. City of Seattle*, 190 Wn.2d 769, 781, 418 P.3d 102 (2018).  "'[W]hen reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law.'"  *Money Mailer, LLC v. Brewer*, 194 Wn.2d 111, 130, 449 P.3d 258 (2019) (internal quotation marks omitted) (alteration in original) (quoting *Harvey v. County of Snohomish*, 157 Wn.2d 33, 43, 134 P.3d 216 (2006)).

### a.      *Independent economic value*

The trial court acknowledged there were genuine issues of material fact as to whether Blue Roots's claimed trade secrets derived independent economic value from not being known to or readily ascertainable by others.  We agree.

25

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Blue Roots introduced evidence that it engages in phenohunting, where it takes commonly available seeds, all with different genetic makeup, grows them into genetically unique plants, and then selects and propagates those plants with the most desirable phenotypical traits, a time- and resource-intensive process. It also introduced evidence that its grow processes use publicly available procedures and materials in novel and unique ways to maximize production.

Biochron advances several unconvincing arguments for why Blue Roots's cultivars do not constitute trade secrets. First, it argues that Blue Roots's cultivars are not protectible because Blue Roots does not breed plants. But Blue Roots's experts explain that each seed has a unique genetic makeup; thus, no other grower has seeds—and eventually plants—with exactly the same genotype as those grown by Blue Roots.

Biochron next argues that phenohunting is not a proprietary process. But Blue Roots does not argue the process is a trade secret; it argues the cultivars are a trade secret. Finally, Biochron argues that the plants cannot be trade secrets because marijuana reproduces sexually. That may be relevant were Blue Roots claiming a trade secret in marijuana seeds, but it is not. It claims that its mother plants, grown from seed, selected through phenohunting, and used to asexually propagate genetically identical clones, are trade secrets. Such information is protectible as a trade secret. *See* 35 U.S.C. § 161

26

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

("Whoever invents or discovers and asexually reproduces any distinct and new variety of plant . . . may obtain a patent therefor.").

Biochron also argues that Blue Roots's growing procedures are not proprietary because they are publicly available. However, publicly available information can still constitute a trade secret when it is not readily ascertainable.[5] *See Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 50, 738 P.2d 665 (1987) ("[T]rade secrets frequently contain elements that by themselves may be in the public domain but together qualify as trade secrets."). Biochron's expert states that Blue Roots uses off-the-shelf nutrients and soil, but Blue Roots's expert states that the specific combination of nutrients, timing of application, and application rates are different than those recommend by the manufacturer or used by other commercial cannabis operations with which he is familiar. Similarly, Biochron's expert points to the fact that trellising plants is common, while Blue Roots's expert describes Blue Roots's trellising technique as novel and unique to Blue Roots. We agree with the trial court, the parties' competing expert reports present genuine issues of material fact as to whether Blue Roots's purported trade secrets derived independent

---

[5] Indeed, Biochron's own briefing suggests that Blue Roots's grow process is *not* readily ascertainable. Biochron assembles various Internet sources to illustrate that the information is publicly available, but in doing so, picks and chooses discrete processes from four unrelated sources, one of which is about bed bugs rather than cannabis.

27

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

economic value from not being known to or readily ascertainable by others.

### b. *Reasonable efforts to protect confidentiality*

The trial court found that the dispositive question on summary judgment was

whether Blue Roots had made reasonable efforts to protect the confidentiality of its trade

secrets. It resolved this question by noting that even if there was a partnership, there was

no fiduciary requirement to protect the alleged trade secrets because "if something is

disclosed, it's not a trade secret." Rep. of Proc. (Mar. 11, 2022) at 42. This

oversimplified statement does not accurately reflect Washington law.

There is no requirement for absolute secrecy under the UTSA. *Precision*

*Moulding & Frame, Inc. v. Simpson Door Co.*, 77 Wn. App. 20, 28, 888 P.2d 1239

(1995); *see also Machen, Inc. v. Aircraft Design, Inc.*, 65 Wn. App. 319, 329, 828 P.2d 73

(1992), *overruled on other grounds by Waterjet Tech., Inc. v. Flow Int'l Corp.*, 140

Wn.2d 313, 996 P.2d 598 (2000). "'[R]easonable use of a trade secret including

controlled disclosure to employees and licensees is consistent with the requirement of

relative secrecy.'" *Machen*, 65 Wn. App. at 327 (quoting UTSA § 1, cmt., 14 U.L.A.

438, 439 (1990)). The trial court erred by concluding that because Blue Roots had

disclosed its alleged trade secrets to Biochron, it could not claim them as trade secrets.

28

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Blue Roots argues that the parties' joint operations formed a partnership; thus, by virtue of Biochron's fiduciary duties, Blue Roots made reasonable efforts to maintain the confidentiality of its trade secrets when it disclosed them in the context of their business arrangement. We agree that, viewing the facts in the light most favorable to Blue Roots, a reasonable mind could conclude that their disclosure of trade secrets was made with efforts that were reasonable under the circumstances to maintain its secrecy. Importantly, a trier of fact could find that Blue Roots's (albeit late) requirement for Biochron's employees to sign an intellectual property and nondisclosure agreement combined with Biochron's willingness, evinced a mutual understanding that Blue Roots's processes and marijuana strains were proprietary and protected.

In addition, Biochron may have had a fiduciary duty not to disclose Blue Roots's trade secrets. Under the "Revised Uniform Partnership Act" (RUPA), chapter 25.05 RCW, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." RCW 25.05.055(1). RUPA also modifies the common law duties partners owe each other and the partnership, limiting them to the duty of loyalty and the duty of care, as defined by the statute. RCW 25.05.165(1). The duty of loyalty includes the duty "[t]o account to the partnership and hold as trustee for it any property, profit, or benefit derived by the

29

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

partner in the conduct . . . of the partnership business or derived from a use by the partner

of partnership property." RCW 25.05.165(2)(a).

Even if no partnership was formed, the record suggests that Biochron was acting

as Blue Roots's agent during their business relationship. "An agency relationship arises

when one party acts at the instance of, and under the direction and control of, another."

*Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 135 Wn. App. 760, 765, 145 P.3d

1253 (2006). Blue Roots provided evidence that Biochron began using Blue Roots's

grow processes and marijuana strains at Blue Roots's instance and under Blue Roots's

direction and control, which Biochron does not dispute. An agent has a duty not to use or

disclose its principal's trade secrets even after the termination of the agency relationship.

*Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 437, 971 P.2d 936 (1999); *see also*

RESTATEMENT (THIRD) OF AGENCY § 8.05 ("An agent has a duty . . . not to use property

of the principal [and] not to use or communicate confidential information of the principal

for the agent's own purposes . . . .").

Blue Roots introduced evidence that it relied on its business relationship with

Biochron to maintain the secrecy of its alleged trade secrets. Blue Roots's lead grower

stated in a declaration: "When we thought we had acquired Biochron, we shared the Blue

Roots Standard Operating Procedures with certain Biochron representatives via a

30

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

password-protected Google drive." CP at 609. One of Blue Roots's owners similarly

declared that Blue Roots's delivery of its mother plants to Biochron

> were not one-off purchases by Biochron. They were entirely dependent on
> the overall deal that the companies reached with one another and had been
> operating under for several months. Access and use of the mother plants
> was entirely dependent on the parties' overall deal, which included
> Biochron's obligation to use Blue Roots['s] proprietary grow methods and
> then sell the harvested products exclusively to Blue Roots.

CP at 642. This is the sort of controlled disclosure that can constitute reasonable efforts

to maintain the secrecy of trade secrets. *See Machen*, 65 Wn. App. at 327. Whether it did

under these circumstances is a question of fact that cannot be resolved on summary

judgment.

Biochron relies on *Pacific Title, Inc. v. Pioneer National Title Insurance Co.*,

33 Wn. App. 874, 658 P.2d 684 (1983), to argue that Blue Roots cannot claim a trade

secret in information it disclosed to Biochron without telling Biochron the information

was confidential. *Pacific Title* is not helpful to Biochron.

In *Pacific Title*, both parties were title insurance companies. *Id.* at 875. They

entered into a 10-year contract in which Pacific acted as the agent of Pioneer, issuing title

insurance policies in Pioneer's name and retaining 87.5 percent of the premiums

collected. *Id.* at 875-76. Pacific sent Pioneer copies of each policy it issued in Pioneer's

name, which Pioneer later provided to a subsequent agent after its contract with Pacific

31

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

ended. *Id.* at 876. Pacific sued for conversion and misappropriation of the title

information it produced, and the trial court dismissed the complaint. *Id.* at 875.

> We affirmed, noting that
>
> > [a]lthough an agent may not use or disclose confidential information obtained during the course of his employment for the principal, a principal may use information developed by the agent during the agency in the scope of work to which the agency relates and for which the principal has paid the agent.

*Id.* at 879 (citations omitted). Because the title information had been "transmitted

pursuant to contract in circumstances where the originator knows or should know that the

recipient has a legitimate business use for the information," we required Pacific to show it

had "secure[d] confidentiality by express or implied provision of the contract." *Id.* We

reasoned that in such a situation, an "originator of information cannot claim a property

right in it as against one to whom he has disclosed it without bringing to the latter's

attention his expectation that the information will be held in confidence and not used in

competition." *Id.* Because the parties did not address their rights to the information

under the contract, Pacific did not have an exclusive right to it. *Id.* at 880.

    *Pacific Title* is not analogous to these facts. Biochron was not the principal of

Blue Roots and thus did not have the right to use information developed by Blue Roots, as

Pioneer did for Pacific.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

c.       *Misappropriation*

Biochron asserts that Blue Roots has no evidence that Blue Roots is currently

using its grow processes. But Blue Roots did present evidence that Biochron continued

using Blue Roots's grow processes after ending their business relationship. Biochron

further argues that it legitimately purchased Blue Roots's mother plants. But Blue Roots

presented evidence that the purchase was made in the context of the parties' business

relationship, evidenced by their sale at significantly below market value in order to

comply with Washington regulations that transferred cannabis plants must have a

recorded sale price. Again, this competing evidence creates a genuine issue of fact

precluding summary judgment.

Because we conclude that the trial court erred in dismissing Blue Roots's

misappropriation of trade secrets claim, Biochron is not prejudiced by arbitrating the

claims that survived the first partial summary judgment order in arbitration rather than

court.

CONCLUSION

The trial court erred in denying Blue Roots's renewed motion to compel

arbitration. Blue Roots did not waive its right to arbitrate because its conduct was not

inconsistent with an intent to arbitrate its claims.

33

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

Biochron is not prejudiced by arbitration being ordered. Biochron would have had to litigate the same claims in trial court as it now must litigate in arbitration.

We remand with directions for the trial court to compel arbitration. The order to compel should state that Blue Roots may not assert claims that were dismissed by the trial court's first order granting partial summary judgment.

_____
Lawrence-Berrey, J.

I CONCUR:

_____
Pennell, J.

34

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

## APPENDIX

## Memorandum Of Understanding

This Memorandum of Understanding (this "MOU") outlines the principal terms and conditions of a proposed purchase of one hundred percent (100%) interest in the assets relating to the operation of the business of Biochron, Inc. by Blue Roots LLC or a related company designated by Blue Roots LLC (individually, each a "Party" and collectively, the "Parties").

This MOU is a commitment by the Parties to complete a transaction as defined in this Agreement and memorialize the terms and conditions in a definitive asset purchase agreement (the "APA") and any related transactions necessary to execute the APA and achieve the Parties' objectives.

### 1  THE PARTIES

Blue Roots LLC is a Washington state company with a business address of 13026 W. McFarlane Rd. Airway Heights, WA 99001 ("Blue Roots"). Blue Roots includes such related company designated by Blue Roots to participate in the APA or related transactions (collectively, the "Purchaser").

Biochron Inc. is a Washington state company, licensed with the Washington State Liquor and Cannabis Board ("WSLCB") and Bureau of Licensing Services under registration # 416641 and with a Washington State Secretary of State Uniform Business Identifier of # 603 466 612, with a business address of 2718 N. Rocky Hill Lane, Liberty Lake, WA 99019 (the "Licensed Operator"). Biochron, Inc. and its principals, Bart Bennett, Kevin Rudeen and John Gillingham collectively act as sellers (collectively, the "Seller").

### 2  THE SALE OF ASSETS

Seller owns assets and inventory used to operate a cannabis business (the "Business") in the State of Washington at the properties set forth on Schedule A. On the Closing (as defined below), Purchaser will secure a one hundred percent (100%) ownership stake in all of the assets of Seller relating to the operation of the Business, including the material properties and assets set forth on Schedule A (collectively, the "Assets"), free and clear from any and all liens, security interests and/or encumbrances, except as disclosed and approved by Purchaser.

All real property will be conveyed via a general warranty deed to Purchaser.

The Assets will be carefully defined in the APA, but asset purchase and transfer will include:

- Purchaser's assumption of all leases and property rights-entitlements held by the Seller relating to facilities in which the Licensed Operator conducts the Business.

Assets purchased will not include an interest in the business entity that holds WSLCB License # 416641.

Page 1 of 4

35

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

**3 PURCHASE PRICE**

The total purchase price to be paid by Purchaser to Seller for the Assets will be as follows (the "Purchase Price"):

(i)     On the 15th day after the sixth full operating month after the execution of an Asset Purchase Agreement, Buyer agrees to pay Seller a payment equal to 10% of the month's net profit generated by Blue Roots, LLC. for a period of ten years, or 120 months. Upon completion of the 120 months, Seller will transfer its license #416641 to Purchaser.

(ii)     Beginning June 1, 2019 Bart Bennett will receive a salary of $5,000 per month as a manager in Blue Roots, LLC. The employment will continue as long as it is mutually satisfactory to Mr. Bennett and Blue Roots, LLC.

**4 DUE DILIGENCE & CONDITIONS TO CLOSING**

Seller will, promptly and in good faith throughout the process, respond to due diligence requests from Purchaser, and Purchaser will, promptly and in good faith, respond to due diligence requests from Seller. The transaction will become effective June 1, 2019.

In addition to other terms and conditions contained herein, the completion of the transaction will be subject to the satisfaction of the following:

(i)     Seller and Buyer obtaining legal analysis of the transaction to make sure it complies with LCB regulations and will be able to obtain necessary consents from regulatory agencies.

The Parties agree that the Closing shall be June 1, 2019 or as mutually agreed in written extensions (the "Closing").

**5 TAX & COMPLIANCE MATTERS**

Purchaser and Seller agree to cooperate in good faith in structuring the transactions contemplated herein to be: (a) tax efficient for all parties; (b) compliant in all material respects with all requirements of the WSLCB or other relevant government agency or regulator; and (c) compliant in all material respects with the applicable corporate charters of the parties involved.

**6 CONFIDENTIALITY**

The existence of this MOU and the terms, conditions, and proposed structures of the transactions set forth are confidential and are not to be disclosed by either party without prior documented consent of the other party, except on a confidential basis to a party's legal advisors and financial advisors for the purpose of evaluating this MOU.

**7 EXCLUSIVE DEALINGS PERIOD**

The "Exclusive Dealings Period" will commence on the date of execution of this MOU by both parties and will continue for a period of sixty (60) days thereafter. Seller and Purchaser agree that, from and after the date of execution of this MOU and through the Exclusive Dealings Period,

Page 2 of 4

36

No. 38834-4-III

*Biochron, Inc. v. Blue Roots, LLC*

Seller will not offer to sell, solicit offers to purchase, or engage in any other negotiations or discussions with any party relating to the Assets used to operate the Business, nor will Seller authorize or permit any other party to do any such things.

## 8   DISPUTE RESOLUTION

The Parties will resolve any discrepancy of interpretation on an amicable basis and with the utmost good will and cooperation. In the event of any irresolvable disagreement between the parties, the parties agree to submit to arbitration via the AMERICAN ARBITRATION ASSOCIATION, to be conducted in the City of Spokane, Washington.

## 9   MISCELLANEOUS

This MOU is entered into in the State of Washington and will be interpreted and governed in all respects by the laws of such state. This MOU may be executed in counterparts, each of which will be deemed an original, and all of which when affixed together will constitute but one and the same instrument. Signatures exchanged by facsimile or authenticated electronic signature will be deemed original signatures for all purposes.

## 10  SIGNATURE BLOCK

By signing below, the signatories acknowledge and assert that: (1) they have carefully read and considered all provisions of this MOU; (2) they have been given ample opportunity to consult with independent legal and business counsel regarding the contents; (3) they understand its terms and conditions; (4) the terms and conditions are fair and reasonable; and (5) they have sufficient authority to enter into this MOU on behalf of the identified party and bind such party to the terms herein.

|  | Purchaser:<br>Blue Roots LLC | Seller:<br>Biochron, Inc. |
|---|---|---|
| Signature | *Allan B. Holms* | *[signature]* |
| Signatory Name | Allan G Holms | BRET BENNETT |
| Title | Managing Member | PRESIDENT |
| Date | May 21, 2019 | 5/21/19 |
| Contact Information | (509) 979-5688 | (509) 979-8724 |
| Email Address | aholms@msn.com | Bret@Biochroninc.Com |

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 38834-4-III
*Biochron, Inc. v. Blue Roots, LLC*

## SCHEDULE A - Assets

**1   Properties (the "Properties"):**

Spotted Road

**2   Business Assets:**

All equipment, leasehold improvements, supplies, tools, etc. used in connection with the Business and/or located at the Properties.  Such equipment and assets to be listed in detail in the APA.

**3   Intellectual Property:**

"Intellectual Property" will be defined in the APA, but it should be understood to mean all domestic and foreign intellectual property rights germane to the Business and possessed by Seller, including: (i) patents and applications for patents; (ii) proprietary and non-public business information, including trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists;

**4   Grow:**

"Grow" to include genetics of any form; tissue culture, seeds, clones or plants.

No. 38834-4-III

FEARING, C.J. (concurring) — I write separately because the majority opinion conflates the concepts of waiver and estoppel rather than analyzing each separately. Waiver is the intentional and voluntary relinquishment of a known right. *In re of Estate of Petelle*, 23 Wn. App. 2d 203, 212, 515 P.3d 548 (2022). Estoppel entails justifiable reliance on an adversary's conduct in such a manner as to change one's position for the worse. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 340, 779 P.2d 249 (1989); *Buchanan v. Switzerland General Insurance Co.*, 76 Wn.2d 100, 108, 455 P.2d 344 (1969). Waiver and estoppel are distinct concepts with differing elements. *Schuster v. Prestige Senior Management, LLC*, 193 Wn. App. 616, 631, 376 P.3d 412 (2016). Strictly defined, waiver describes the act, or the consequences of the act, of one party only, while estoppel exists when the conduct of one party has induced the other party to take a position that would result in harm if the first party's act were repudiated. *Pitts v. American Security Life Insurance Co.*, 931 F.2d 351, 357 (5th Cir. 1991). Estoppel involves some element of reliance or prejudice on the part of the party asserting estoppel. *Pitts v. American Security Life Insurance Co.*, 931 F.2d 351, 357 (5th Cir. 1991). Waiver

No. 38834-4-III  (concurrence)
*Bichron, Inc. v. Blue Roots, LLC*

requires no reliance.  *Schuster v. Prestige Senior Management, LLC*, 193 Wn. App. 616, 632 (2016).

Biochron, Inc. only contends that Blue Roots, LLC waived the right to arbitration. Therefore, I would not examine whether Biochron relied on conduct or statements of Blue Roots or whether Biochron suffered any prejudice.  I agree with the majority's astute analysis and implied ruling that Blue Roots never intentionally relinquished the right to arbitration.

I do not blame the majority author for conflating the concepts of waiver and estoppel.  For some unknown and odd reason, all Washington decisions, if not also all foreign decisions, meld the two concepts in the context of arbitration.  *Schuster v. Prestige Senior Management, LLC*, 193 Wn. App. 616, 632-34 (2016).

I concur:

_____
Fearing, C.J.

2